IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALEXANDER BRANDON SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 18 C 1008 |
| | ) | |
| SKOKIE MOTOR SALES, INC., d/b/a | ) | Judge John Z. Lee |
| SHERMAN CHRYSLER, DODGE | ) | |
| JEEP, RAM, a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Alexander Smith has his sued his former employer, Skokie Motor Sales ("Dealership"). Smith alleges that the Dealership created a hostile work environment and then fired him because of his race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. The Dealership has moved for summary judgment [115]. For the reasons below, the motion is denied.

### Background[1]

The Dealership sells Chrysler, Dodge, Jeep, and Ram vehicles from its Skokie, Illinois showroom. Def.'s LR 56.1 Stmt. Material Facts ("Def.'s SOF") ¶ 1, ECF No. 117. As relevant here, the Dealership assigns some of its salespeople to the "U R Approved" ("URA") group. *Id.* ¶ 2. That group specializes in marketing cars to buyers with low credit ratings. *Id*.

---

[1] The following facts are undisputed or have been deemed admitted, unless otherwise noted.

Smith, an African-American man, started as a salesperson with the URA group in June 2012. *Id*. ¶ 3. The parties dispute whether Smith was good at his job. As Smith sees it, the Dealership repeatedly gave him a bonus for selling the most or second most cars in a given month. Pl.'s LR 56.1 Resp. Stmt. Mat. Facts ("Pl.'s RSOF") ¶ 40, ECF No. 122. The Dealership retorts that it expected employees to sell ten vehicles a month, and that Smith never met that standard. Def.'s SOF ¶ 41.

Almost a year into Smith's tenure, the Dealership recruited Rick Boerman to supervise the URA department. *Id*. ¶ 7. At the outset, Boerman made it his "personal goal" for the department to sell 100 cars per month. *Id*. ¶ 34. To reach that goal, Boerman hoped that each of his employees would sell at least ten cars a month. *Id*. According to Smith, Boerman never shared that expectation with his team. Pl.'s RSOF ¶ 39.

During his time as Smith's supervisor, Boerman repeatedly made statements that offended him. For example, Boerman told his team that, "I'll give you a hundred dollars if you could bring in an old, black motherfucker with a cane [to buy a car]."[2] Def.'s SOF ¶ 13. Along the same lines, Smith asserts that Boerman played songs over the URA department's speakers that featured offensive lyrics (including the word

---

[2] In its reply brief, the Dealership asserts that Boerman only said this once, not multiple times. *See* Def.'s Reply at 9, ECF No. 124. But the Dealership's own LR 56.1 statement admits that Boerman made this remark "at a few Saturday morning sales meetings." Def.'s SOF ¶ 13. For the purpose of resolving this motion for summary judgment, the Court assumes that Boerman made the comment more than once. As an aside, the Court also notes that the quantity of offensive remarks is rarely dispositive. *See, e.g.*, *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) ("We have repeatedly recognized that even one act of harassment will suffice if it is egregious.").

"nigger") and that Boerman would sing along. *Id.* ¶ 21. Boerman denies doing so. *Id.* ¶ 55.

At the time, the Dealership maintained an anti-harassment policy that outlined a formal process for employees to complain about their supervisors. Def.'s SOF ¶ 21; Pl.'s LR 56.1 Stmt. Additional Facts ("Pl.'s SOAF") ¶ 10, ECF No. 122. Smith never made use of that procedure. Def.'s SOF ¶ 21. Still, when the Dealership's owner and general manager asked Smith how things were going in the URA department, he reported:

> [T]here [are] a lot [of] straw purchases going on.[3] We have to falsify documents. We're lying to the banks. We're lying to the customers. Boerman is back there going through a power trip. He wants to fire all the women and blacks. [Boerman even said] 'I'm going to fire all you motherfuckers and hire my friends if you don't go along with my program.'

Def.'s SOF ¶ 27; Def.'s Ex. A, Smith Dep. 180:12–22, ECF No. 117-1.

On Saturday, May 25, 2013, Smith told Boerman that his cousin had passed away, and that he would need time off to attend the funeral later that week. Def.'s RSOF ¶ 51. Boerman promptly approved Smith's time-off request. *Id.* ¶ 56. That Friday, May 31, Smith advised Boerman that the funeral would be held the next day and that he would miss work. *Id.* ¶ 52. At that point, Smith says that Boerman erupted:

> "I'm tired of you niggers coming and going and doing whatever the fuck you want to do. . . . I'm tired of you niggers coming and going as you see

---

[3] "A straw purchase [occurs] when a car salesperson puts the name of a person on the loan documents and that person is not the intended owner of the vehicle." Def.'s SOF ¶ 25. The Dealership prohibits its employees from arranging straw purchases. *Id.*

fit. This shit is going to change around here. I'm going to get rid of all you motherfuckers and hire my friends."

Pl.'s RSOF ¶ 53; Smith Dep. at 180:14–22. Again, Boerman denies saying this. Def.'s SOF ¶ 55.

The following Saturday, June 8, Smith says that he called one of the Dealership's managers to tell him that he was sick and would not come to work that day. *Id.* ¶ 63. The manager replied: "All right. See you Monday. Just bring a [doctor's] note." *Id.* When Smith returned to work that Monday, he claims to have handed Boerman a note from his doctor. *Id.* ¶ 66. Later that day, Boerman walked over and said, "I think we have to part ways." *Id.* ¶ 68. Shortly thereafter, Boerman prepared a formal termination letter explaining that "[Smith] missed two Saturdays in a Row. Low Productivity. Terminated." *Id.* ¶ 71. Believing that Boerman harassed and then fired him because of his race, Smith filed this lawsuit.

## **Legal Standard**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmovant must then set forth specific facts demonstrating that there are disputed material facts that must be decided at trial. *Id.* at 321–22.

4

## Analysis

I.  **Evidentiary Determinations**

As an initial matter, the Dealership challenges the admissibility of three statements Smith made during his deposition. First, Smith described a conversation in which Terrance Thrower, a co-worker, told him that Boerman had voiced certain offensive comments. *See* Pl.'s SOAF ¶ 6. But, as the Dealership points out, Smith's attorneys notified the magistrate judge that they would not rely on Thrower's remarks during summary judgment or trial. *See* Def.'s Ex. Z, 6/5/19 Transcript at 5, ECF No. 117-1. For that reason, the statement of fact that recounts Thrower's commentary is stricken.

Second, Smith detailed his discussion with Jamila Redditt, another co-worker. Pl.'s SOAF ¶ 7; Smith Dep. at 48:24–49:4. As Smith would have it, Redditt informed him that she had heard Boerman denigrate black employees as "monkey boy[s]" and "black monkey[s]." *Id*. But this testimony involves two layers of hearsay: Boerman's statement to Reddit and then Reddit's statement to Smith. To be sure, the "monkey boy" remark falls under the exception for statements made by agents of a party opponent acting within the scope of their employment. *See* Fed. R. Evid. 801(d)(2)(D). Still, Smith has not highlighted—and the Court has not found—any hearsay exception that covers Reddit's comment to Smith. And there is no doubt that Reddit's statement is offered for the truth of the matter—namely, that Boerman disparaged black employees as "monkey boy[s]." Smith Dep. at 48:24–49:4; *see* Fed. R. Evid.

801(c). Accordingly, the factual statement that relays Smith's conversation with Reddit is stricken. *See* Pl.'s SOAF ¶ 7.

Finally, a third co-worker named Juan Ochoa advised Smith that he had overheard Boerman use the word "nigger" when Smith requested time off to attend the funeral. *See* Pl.'s SOAF ¶ 14. But Ochoa's remark runs afoul of the same hearsay problem as Redditt's. Thus, the statement of fact that relates Ochoa's statement is stricken. *See id.* With these evidentiary determinations in mind, the Court turns to Smith's Title VII claims.[4]

## II. Merits

Smith maintains that the Dealership created a hostile work environment and then fired him based on his race in violation of Title VII. To survive a motion for summary judgment, a Title VII plaintiff "must prove three elements: (1) he is a member of a class protected by the statute, (2) that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and (3) that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citation omitted).

In articulating his Title VII claims, Smith outlines two distinct theories. *See* Am. Compl. ¶¶ 25, 26, ECF No. 32. First, he submits that the Dealership allowed

---

[4] The Dealership also questions the admissibility of Smith's assertion that "[t]he EEOC determined after investigation that reasonable cause to believe that Defendant discriminated against Plaintiff on the basis of race exists." Pl.'s RSOF ¶ 5. Because Smith never explains the relevance of the EEOC's determination, the Court declines to consider it for the purposes of deciding this motion.

6

Boerman, a supervisor, to create a hostile work environment. *Id.* ¶ 25. Second, he suggests that the Dealership fired him because of his race. *Id.* ¶ 26.

### A. Hostile Work Environment

Smith first argues that the Dealership subjected him to a hostile work environment. "To prove that an employment environment was actionably hostile, a plaintiff must show that: (1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 636 (7th Cir. 2019).

Even if an employee establishes all four elements, "[a]n employer may escape liability if it can show the hostile work environment was not accompanied by an adverse action and prove an affirmative defense." *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627–28 (7th Cir. 2019). "The *Faragher-Ellerth* defense is one such defense and requires the employer prove by a preponderance of the evidence that: (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 805–06 (1998) and *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998)).

Here, the Dealership does not contest the first, second, or fourth elements of a hostile work environment claim.[5] Instead, it contends that Boerman's conduct was not severe or pervasive enough to create a hostile work environment. It also invokes the *Faragher-Ellerth* affirmative defense.

1. **Severe or Pervasive Harassment**

The main dispute between the parties is whether a reasonable jury could find that Smith faced "objectively" severe or pervasive harassment. *Smith v. Northeastern, Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (citation and quotation marks omitted). It is well-established that the "severe or pervasive" requirement "is disjunctive, not conjunctive; the standard may be met by a single extremely serious act of harassment or by a series of less severe acts." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). Whether that standard is satisfied hinges on "the severity of the alleged conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with the employee's work performance." *Gates*, 916 F.3d at 636.

---

[5] At times, the Dealership seems to suggest that Smith did not perceive his work environment as hostile. But Smith apparently complained to the Dealership's manager that Boerman "wanted to fire all the women and blacks." Def.'s SOF ¶ 27. That is enough for a reasonable jury to conclude that Smith felt he was being harassed. *See, e.g.*, *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2008) (finding that an employee who told a manager that her supervisor's behavior was "unacceptable" demonstrated "an unwillingness to tolerate further harassment").

8

Setting aside the inadmissible statements made by Thrower, Redditt, and Ochoa, Smith's hostile work environment claim rests on three allegations:[6]

- First, during several meetings, Boerman informed the assembled salespeople—including Smith—that "I'll give you a hundred dollars if you could bring an old, black motherfucker with a cane." Pl.'s RSOF ¶ 13.

- Second, Boerman played music on the Department's speakers and then sang along with lyrics that included the word "nigger." Pl.'s RSOF ¶ 21.

- Third, when Smith reminded him that he was taking time off to attend a funeral, Boerman replied: "I'm tired of you niggers coming and going and doing whatever the fuck you want to do. Fuck that. . . . I'm tired of you niggers coming and going as you see fit. This shit is going to change around here. I'm going to get you of all you motherfuckers and hire my friends." Pl.'s RSOF ¶ 53; Smith Dep. at 180:12–22.

Based on these incidents, a reasonable jury could find that Smith experienced severe or pervasive harassment. First and foremost, Smith alleges that Boerman called him a "nigger" after he requested time off. *See* Pl.'s RSOF ¶ 53. As the Seventh Circuit has recognized, "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor." *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 671, 675 (7th Cir. 1993). Thus, Boerman's use of that term to disparage Smith goes a long way toward establishing the severe or pervasive harassment element.

Although the Dealership makes three attempts to downplay the significance of that incident, none is persuasive. First, the Dealership highlights apparent

---

[6] While Boerman disputes these allegations, the Dealership admits them to be true for the limited purpose of resolving its motion for summary judgment. *See* Def.'s SOF at 1 n.1.

9

inconsistencies in Smith's account of what Boerman said. *See* Def.'s Reply at 5 n.4, ECF No. 124 (citing differences between Smith's EEOC submissions, complaint, discovery responses, and deposition testimony). But the extent to which those discrepancies undermine Smith's credibility is a question for a jury to decide at trial. *See McCottrell v. White*, 933 F.3d 651, 655 (7th Cir. 2019).

Second, the Dealership disputes whether Boerman used the word "nigger" to describe Smith. *See* Def.'s Reply at 10–12. It is true that "when harassment is directed at someone other than the plaintiff, the impact of [that] second-hand harassment is obviously not as great." *Northeastern*, 388 F.3d at 567. But, if Smith's account is accurate (which we must assume for the purposes of this motion), Boerman undoubtedly directed the epithet at him. According to Smith, when he requested a day off, Boerman replied that he was "tired of *you* niggers coming and going . . . ." *See* Pl.'s RSOF ¶ 53 (emphasis added). In light of that testimony, a reasonable jury could conclude that Boerman meant to address Smith and other black employees.

That distinguishes *Northeastern*, the main case the Dealership invokes. In *Northeastern*, a university administrator overheard a supervisor disparage their co-workers as "black motherfuckers." 388 F.3d at 566–67. The administrator later learned that the supervisor had referred to those same employees as "motherfucking niggers" on several other occasions. *Id*. In refusing to treat the supervisor's remarks as a form of severe or pervasive harassment, the Seventh Circuit stressed that: (1) "the harassment . . . was not directed at [plaintiff]," and (2) she "never personally heard [her supervisor] utter the word [nigger]." *Id*. Given that Boerman allegedly

10

called Smith a "nigger" to his face, neither of those rationales extend here. The same logic also explains why *Peters v. Renaissance Hotel Operating Co.*, another case the Dealership cites, does little to reinforce its position. 307 F.3d 535, 552 (7th Cir. 2002) (emphasizing that "the one comment [that included the word 'nigger'] was not directed at [plaintiff]").

Third, the Dealership contends that a single use of the word "nigger" can never be enough to establish an objectively hostile work environment. Def.'s Mem. Supp. Mot. Summ. J. ("Summ. J. Mot.") at 14, ECF No. 116. But the cases the Dealership cites to support that proposition feature co-workers who employed that epithet, not supervisors.[7] *See, e.g.*, *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014); *McPhaul v. Bd. of Comm'rs of Madison Cty.*, 226 F.3d 558, 567 (7th Cir. 2000), *overruled in part on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). The distinction between supervisors and colleagues matters because a "supervisor's use of the term 'n----r' impacts the work environment far more severely than use by co-equals." *Rodgers*, 12 F.3d at 675.

*Gates*, the most recent Seventh Circuit opinion to analyze this issue, suggests that even one use of that term by a supervisor may qualify as severe harassment.

---

[7] The Dealership also briefly invokes *Sanders v. Vill. of Dixmoor, Ill.*, 178 F.3d 869, 870 (7th Cir. 1999) and *Maldonado v. Invensys Bldg. Sys., Inc.*, 157 F. App'x 904, 906 (7th Cir. 2005). But neither case helps the Dealership. In *Sanders*, the plaintiff waived argument as to whether his supervisor's remarks created an objectively hostile environment. 178 F.3d at 870. And the Federal Rules of Appellate Procedure do not permit citation to *Maldonado*, an unpublished Seventh Circuit decision issued before 2007. *See* Fed. R. App. P. 32.1(a).

11

"[W]hen the harassment involves such appalling racist language in comments made directly to employees by their supervisors," the Court of Appeals warned, "we have not affirmed summary judgment for employers." 916 F.3d at 639. And, although the Dealership reads *Gates* as limited to circumstances where a supervisor "repeated[ly] uses . . . racist language," this is not entirely so. Def.'s Reply at 14. The Seventh Circuit's analysis turned on "the differences between supervisors and co-workers and between direct and indirect harassment," not the quantity of racist remarks. *Gates*, 916 F.3d at 640. Indeed, the *Gates* court underscored that "there is no magic number of slurs needed to show hostile work environment." *Id*. (citation and quotation marks omitted).

What is more, the Dealership's effort to minimize Boerman's remark as an "isolated in[cident]" overlooks his other uses of racially-charged language. Mot. Summ. J. at 14. According to Smith, Boerman denigrated prospective customers as "black motherfuckers" during several sales meetings. Pl.'s RSOF ¶ 13; *see Northeastern*, 388 F.3d at 567 (classifying the term "black motherfuckers" as "racially-tinged [and] offensive"). In the same vein, Boerman allegedly played music with offensive lyrics and then sang along in front of employees and customers. *See* Pl.'s RSOF ¶ 21. As the Seventh Circuit has recognized, "[r]epeated use of such highly offensive terms may create an objective hostile work environment, even if they are heard secondhand." *Gates*, 916 F.3d at 638. It follows that a rational jury could decide that Boerman's indirect statements contributed to the severity and pervasiveness of the harassment that Smith faced.

As a fallback position, the Dealership insists that Boerman's conduct did not "unreasonably interfere[ ] with [Smith]'s work performance." *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). In support, it points out that Smith never formally complained about Boerman and that his sales numbers rose slightly in the month after Boerman's appointment. But "[i]nterference with work performance is only one factor among many in the calculus." *Perales*, 894 F.3d at 830. That factor deserves less weight here because the alleged harassment took place over only a few weeks, meaning that there was little time for it to influence Smith's sales numbers. *See* Def.'s SOF ¶¶ 52, 68 (Boerman called Smith a "nigger" on May 31st and fired him on June 10th).

Besides, Smith allegedly warned the Dealership's owner and general manager that Boerman "wanted to fire all the women and the blacks." Def.'s SOF ¶ 27. It is true that Smith also complained that Boerman encouraged him to lie to banks, falsify documents, and arrange straw purchases. *Id.* Drawing reasonable inferences in his favor, however, a jury could view Smith's complaint as evidence that Boerman's behavior disrupted his work. Ultimately, taking in account Boerman's direct use of the word "nigger", his indirect statements, and the abbreviated period in which the alleged harassment occurred, Smith has established a triable issue regarding the severe or pervasive element of his claim.

### 2. The *Faragher-Ellerth* Defense

The Dealership next argues that it is entitled to summary judgment because of the *Faragher-Ellerth* defense. That affirmative defense bars a hostile work

13

environment claim when: (1) "the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior," and, (2) "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807; *Ellerth,* 524 U.S. at 765.

But the Dealership has not met its burden of establishing the *Faragher-Ellerth* defense as a matter of law. An employer cannot invoke that defense if "[a] supervisor's harassment culminates in a tangible employment action, such as discharge, demotion or undesirable reassignment." *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (citation omitted). In such a case, "the supervisor's harassment must have resulted in [the adverse] action." *Jackson v. Cty. of Racine*, 474 F.3d 493, 501 (7th Cir. 2007) (citation omitted). Here, the parties agree that Boerman (a supervisor) fired Smith, but dispute whether Boerman's harassment resulted in Smith's dismissal.

Based on the record, a reasonable jury could find that Boerman's harassing conduct caused Smith's termination. According to Smith, Boerman swore that he was "tired of you niggers coming and going" and threatened to "get rid of all you motherfuckers." Pl.'s RSOF ¶ 53. Less than two weeks later, Boerman fired Smith. Def.'s SOF ¶ 68. Given that Boerman dismissed Smith shortly after promising to "get rid" of black employees, a factfinder may well conclude that the harassment resulted in Smith's discharge. Pl.'s RSOF ¶ 53.

In short, the Dealership has not carried its burden of establishing that it is entitled to the *Faragher-Ellerth* affirmative defense as a matter of law. The result is that Smith's hostile work environment claim survives summary judgment.

### B. Termination

Smith also raises a wrongful termination claim under Title VII. To sustain such a claim, the proponent must produce enough evidence to persuade a reasonable factfinder that "the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

At the outset, the Dealership insists that Smith has waived this claim. *See* Def.'s Reply at 4 n.2. The Court disagrees. In his amended complaint, Smith outlines two Title VII claims: one for harassment, the other for termination. *See* Am. Compl. ¶¶ 26, 27. And the first paragraph of his response brief suggests that he continues to press both theories. *See* Pl.'s Resp. at 1, ECF No. 121 ("Plaintiff will prove . . . that Boerman's discriminatory animus motivated a) his harassment of plaintiff and b) his termination of Plaintiff."). To be sure, some statements in Plaintiff's response hint at waiver, *see, e.g., id.* ("[T]his is a harassment case where a tangible employment action was taken, termination."). Taken as a whole, however, Smith's brief makes clear that he does not intend to abandon his Title VII termination claim. *See e.g., id.* at 14–15 (citing *Ortiz*, 834 F.3d 760, and asserting that race motivated his dismissal).

The next question is whether Smith has created a genuine issue of fact for trial as to his disparate treatment claim. Under *McDonnell Douglas*, a plaintiff must present evidence that "(1) [ ]he is a member of a protected class, (2) [ ]he was meeting

15

the [employer's] legitimate expectations, (3) [ ]he suffered an adverse employment action, and (4) similarly situated employees outside of h[is] protected class were treated more favorably." *Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Because Smith fails to highlight a comparable employee who received better treatment, he cannot make use of that framework.[8]

But a Title VII plaintiff need not rely on *McDonnell Douglas* to withstand summary judgment. *Ortiz*, 834 F.3d at 765. Instead, an employee may "simply point to evidence in the record from which a reasonable jury could find prohibited discrimination." *Curtis v. City of Chi.*, No. 16 C 8042, 2019 WL 3776154, at *10 (N.D. Ill. Aug. 12, 2019). Considering Boerman's alleged promise to "get rid of all you [black] motherfuckers" the Court has little doubt that a jury could reasonably find in Smith's favor on this issue. Pl.'s RSOF ¶ 53.

Once again, the Dealership attempts to downplay Boerman's statement as a stray remark. For a statement to show that prohibited animus motivated an adverse employment action, it must be: "(1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010). All three requirements

---

[8] The Dealership has submitted a list of former URA department employees, their race, and when they were fired. Def.'s Ex. Y, Employee Spreadsheet, ECF No. 117-1. According to that list, three white employees and four black employees were dismissed in May 2013. But the spreadsheet does not provide enough information about those employees—such as their productivity or attendance record—for the Court to tell whether they are comparable to Smith.

are present here: Boerman served as a supervisor; he dismissed Smith less than two weeks after allegedly making the racist remark; and the remark included a threat to "get rid" of black employees. Def.'s SOF ¶¶ 9, 66; Pl.'s RSOF ¶ 53.

The Dealership's main counterargument is that Smith's absence on two consecutive Saturdays (June 1st and June 8th) and low sales numbers qualify as legitimate reasons for firing him that have nothing to do with race. *See* Def.'s SOF ¶ 71. Taking Smith's account as true, however, a rational factfinder could disbelieve both explanations. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014) ("An employee can demonstrate that the employer's reasons are not credible through evidence showing that the proffered reasons had no basis in fact, were insufficient to motivate discharge, or did not actually motivate his discharge.").

For starters, because the Dealership apparently approved both of Smith's Saturday absences, a reasonable jury could conclude that the first stated reason for termination "had no basis in fact." *Id.* As to Saturday, June 1, the Dealership admits that Boerman authorized Smith to miss work that day. Def.'s SOF ¶ 56. As for Saturday, June 8th, Smith avers that the Dealership's sales manager told him that he could take that day off so long as he brought in a doctor's note, which he says that he did. *See* Pl.'s RSOF ¶ 56, 63. If a jury believes that testimony, it could discount the Saturday absences as a pretextual reason for Smith's firing.[9]

---

9   The Dealership makes much of Boerman's statement that "I didn't fire [Smith] because of the Saturday that I gave him permission for." Def.'s SOF ¶ 72. But the termination letter identifies "miss[ing] two Saturdays in a [r]ow" as a reason for firing Smith, and Boerman testified that those two Saturdays were June 1 and June 8, 2013. *Id.* ¶ 71.

17

Likewise, whether low productivity prompted Smith's dismissal depends on credibility determinations that are best left to a jury. As the Dealership sees it, Boerman expected each of his employees to sell ten cars a month, Def.'s SOF ¶ 35, and Smith never hit that goal, *id.* ¶ 42. During his deposition, however, Smith testified that his managers directed him to sell five to seven vehicles a month, *see* Pl.'s RSOF ¶ 40, and that he sometimes won awards for selling the most or second most vehicles, *id.* ¶ 41. Of course, the parties agree that Smith sold four and a half cars the month before he was fired, just below the standard that Smith says his managers had set.[10] Def.'s SOF ¶ 42. Still, given Smith's avowedly high performance in the past, and that he missed the five-unit threshold by half a unit, a reasonable jury could doubt that low performance "actually motivated his discharge." *Widmar*, 772 F.3d at 465.

At bottom, the fate of Smith's Title VII termination claim hinges on whose story a jury believes. If a jury concludes that Boerman said what Smith claims he did, then it could find that race motivated the dismissal. If Boerman's account proves more credible, however, a jury may well decide that poor performance justified Smith's firing. Only a trial can determine which account prevails.

---

Thus, the Dealership's admissions suggest that Boerman fired Smith for missing Saturday, June 1, even though he authorized that absence.

[10] Under the Dealership's system, "a car salesperson [who] assisted on a sale of a car with another salesperson . . . would get credit for selling .5 units." Def.'s SOF ¶ 43.

18

## **Conclusion**

For the reasons given above, the Dealership's motion for summary judgment is denied. A status hearing is set for 4/9/20 at 9:00 a.m., at which time the parties should be prepared to set deadlines for pretrial filings, a date for the pretrial conference, and a date for trial.

**IT IS SO ORDERED.**          **ENTERED: 3/16/20**

_____
**JOHN Z. LEE**
**United States District Judge**